## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **BETTY M. BUSH,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action Nos. 1:02cv00165 |
| | ) | 1:05cv00022 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In these consolidated social security cases,[1] I vacate the final decision of the Commissioner denying benefits and remand the plaintiff's claims for further consideration in accordance with this Memorandum Opinion.

### I. Background and Standard of Review

Plaintiff, Betty M. Bush, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2005).  Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C.A. § 636(c)(1).

---

[1]By order dated August 24, 2005, Civil Action No. 1:05cv00022 was consolidated with Civil Action No. 1:02cv00165.

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bush protectively filed an initial application for DIB on December 7, 1999, alleging disability as of August 6, 1999, and later amended the onset date to August 16, 1999, based on back pain, leg pain, numbness of the feet, anxiety and depression. (R. at 133-36, 139, 168.) This application was denied by decision dated September 12, 2000. (R. at 24.) The Appeals Council denied Bush's request for review, and she did not pursue this claim further. (R. at 24.) Bush then filed a subsequent DIB application on or about December 26, 2000, again alleging disability as of August 16, 1999, based on depression.[2] (R. at 331-33, 374.) Her claim was denied by decision dated July 24, 2002. (R. at 44-53.) The Appeals Council denied Bush's request for review. (R. at 37-38.) Bush then filed a civil action in this court, but on the Commissioner's motion to remand the case for failure to locate Bush's file, the case was remanded by district court order dated April 21, 2003. (R.

---

[2]Although Bush claimed disability based on other ailments, the Disability Report is illegible. (R. at 345.)

at 302-05.)  By order dated June 4, 2003, the Appeals Council remanded Bush's claim in order to reconstruct the record, provide Bush an opportunity to appear at a hearing and to issue a new decision based on the record as reconstructed.  (R. at 300-01.) During the time that Bush's case was pending before this court, she protectively filed subsequent applications for DIB and SSI on January 22, 2003, again alleging disability as of August 16, 1999, based on back pain and spasms and burning and aching of the heels.[3]  (R. at 338-41, 413, 682-85.)  Bush's claims were denied initially and on reconsideration.  (R. at 687-89, 692, 694-96.)  Bush filed a request for a hearing before an administrative law judge, ("ALJ").  (R. at 316.)  The applications filed on December 26, 2000, and January 22, 2003, were consolidated for hearing and decisional purposes.  (R. at 25.)  A hearing was held on January 13, 2004, and a supplemental hearing was held on August 23, 2004.  (R. at 84-100, 101-14.)  Bush was represented at both hearings.  (R. at 84, 101.)[4]

By decision dated August 27, 2004, the ALJ denied Bush's claims.  (R. at 24-31.)  The ALJ found that Bush met the disability insured status requirements of the Act for disability purposes through the date of the decision.  (R. at 31.)  The ALJ found that Bush had not engaged in substantial gainful activity since August 16, 1999. (R. at 31.)  The ALJ also found that Bush suffered from the medically determinable impairment of fibromyalgia,[5] but that she did not suffer from any severe impairments.

---

[3]Although Bush claims disability based on other ailments, the Disability Report is illegible.  (R. at 384.)

[4]Bush was represented by Eric Reese, a paralegal with the law firm of Browning, Lamie & Gifford, P.C.

[5]Fibromyalgia is a chronic condition causing pain, stiffness and tenderness of the muscles, tendons and joints.  Fibromyalgia also is characterized by restless sleep, awakening

-3-

(R. at 31.) Therefore, the ALJ concluded that Bush was not disabled as defined by the Act and was not eligible for benefits. (R. at 31.) *See* 20 C.F.R. §§ 404.1520(c), 416.920(c) (2005).

After the ALJ issued his decision, Bush pursued her administrative appeals, (R. at 19), but the Appeals Council denied her request for review. (R. at 13-14.) Bush then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). This case is before this court on the Commissioner's motion for summary judgment filed October 11, 2005.

## II. Facts and Analysis

Bush was born in 1961, (R. at 87, 133, 331), which classifies her as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). She has an eighth-grade education and training to be a nurse's aide. (R. at 87-88, 145, 351, 390.) She has past relevant work experience as an inspector, an assembler, a stainer at a furniture factory and a nurse's aide. (R. at 140, 152, 174, 346, 358, 380-82, 385, 398, 429.)

At her hearings, Bush testified that she last worked as a nurse's aide "on and off" for seven or eight years. (R. at 88.) She further testified that she had worked as a quality control inspector in an automotive parts plant and in a battery plant, as well as in a sewing factory. (R. at 88.) Bush testified that she had been diagnosed with

---

feeling tired, fatigue, anxiety, depression and disturbances in bowel function. Fibromyalgia was formerly known as fibrositis. *See* http://www.medicinenet.com/fibromyalgia/article.htm.

-4-

fibromyalgia, bursitis and plantar fascitis.[6] (R. at 90.) She stated that she experienced back pain, shoulder muscle pain, migraine headaches, leg pain and foot pain. (R. at 89.) Bush further testified that she took medication for her nerves and that she experienced bad panic attacks preventing her from being around crowds of people. (R. at 90.) She stated that, at that time, she was taking Lortab, Xanax, a blood pressure pill, Flexeril, Prozac and Relafen. (R. at 90.) She testified that these medications made her sleepy. (R. at 91.)

Bush testified that she was then-currently in mental health counseling at Stone Mountain Health Services. (R. at 91.) She estimated that she could stand for approximately five minutes due to pain and burning of the feet. (R. at 91.) Bush stated that sitting and standing also aggravated her back and foot pain. (R. at 92.) Bush stated that she sometimes had to use a walker and that she needed assistance getting out of bed and going to the bathroom at times. (R. at 92.) She stated that she had difficulty kneeling, crouching, crawling, squatting and bending due to leg pain. (R. at 92.) Bush testified that she was constantly fatigued. (R. at 92.) She stated that she had a driver's license, but had not driven in two or three years for fear of going out. (R. at 92-93.) Bush testified that her daughter took her grocery shopping, but that she sometimes had to return to the car before finishing. (R. at 97-98.) She further stated that she rarely cooked, that she did laundry and that she swept, but had to take frequent breaks. (R. at 98.)

Bush testified that she enjoyed working word puzzles and listening to the radio.

---

[6]Plantar fascitis is inflammation of the fascia of the sole of the foot. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 614, 1303 (27th ed. 1988).

(R. at 93.)  She stated that her daughter helped her with housework.  (R. at 93.)  She stated that she usually sat around the house, but tried to dust a little and do a little vacuuming.  (R. at 94.)  Bush testified that she could usually feed herself, but that she needed help dressing.  (R. at 93.)  She stated that her pain medications started working approximately an hour after taking them and that they lasted for approximately five hours.  (R. at 94.)  Bush testified that her pain affected her ability to concentrate and focus and interfered with her enjoyment of working word puzzles and listening to the radio.  (R. at 94.)  She stated that she had not had a day without pain in the previous four years.  (R. at 94.)

Thomas Schacht, Ph.D., a psychological expert, was present and testified at Bush's supplemental hearing.  (R. at 103-08.)  Schacht testified that if the most recent IQ testing were accepted, in spite of school records, Bush would have a borderline IQ, which would be deemed an impairment.  (R. at 106.)  However, Schacht noted that there was no explanation for the drop in IQ scores, other than one mention of alcohol use.  (R. at 106.)  Schacht further testified that the MMPI-2 test, administered by psychologist Latham, was invalid because it was consistent with exaggeration of symptoms.  (R. at 106.)  He further noted that Bush's treating physician noted a better response to treatment than Bush had reported to Latham, thus indicating a credibility issue.  (R. at 106.)  Schacht testified that if Latham's narrative report were accepted, Bush would be able to perform simple, low-stress work with objects rather than people.  (R. at 107.)

Dr. Edward L. Griffin, M.D., a medical expert, also was present and testified at Bush's supplemental hearing.  (R. at 108-13.)  Dr. Griffin testified that Bush did not

-6-

have an impairment that met or equaled a listed impairment. (R. at 109.) He further noted that there were no significant functional exertional limitations. (R. at 109.) Dr. Griffin testified that he was basing these findings on an essentially normal MRI of the back, with the exception of an annular fissure at the L4-5 level with no evidence of a herniated disc or bulging disc, Bush's favorable response to anti-inflammatory medications, muscle relaxants and narcotic analgesics, Bush's inconsistent reporting to Dr. Basa and the findings at the University of Virginia of no autoimmune disease. (R. at 109-10.) Dr. Griffin noted that Bush exhibited diffuse trigger points consistent with fibromyalgia. (R. at 110.) Dr. Griffin further noted that Bush's physical complaints tended to be aggravated by social stressors, which was typical in fibromyalgia patients. (R. at 110-11.) Dr. Griffin testified that it appeared that Dr. Basa's findings were based on Bush's subjective complaints. (R. at 111.) He further testified that fibromyalgia was not a disease, but a constellation of symptoms. (R. at 112.) However, Dr. Griffin testified that those symptoms, in and of themselves, would not necessarily suggest limitation. (R. at 112-13.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Russell County Medical Center; Stone Mountain Health Services; Dr. Frank M. Johnson, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; Johnston Memorial Hospital; Dr. Timothy G. McGarry, M.D., an orthopaedist; Frontier Health, Inc.; University of Virginia Medical Center; Wise County Counseling Center; University of Virginia Health System; Dr. Robert O. McGuffin, M.D., a state agency physician; Dr. Ranjy C. Basa, M.D.; Virginia Public Schools; Sharon J. Hughson, Ph.D., a licensed clinical psychologist; Dr. F. Joseph Duckwall, M.D., a state agency

physician; R.J. Milan Jr., Ph.D., a state agency psychologist; and Edward E. Latham, Ph.D., a licensed clinical psychologist.

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining

-8-

whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Bush argues that the ALJ erred by failing to find that she suffered from a severe impairment, arguing that both her fibromyalgia and mental impairments were severe. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 20-34.) For the following reasons, I find that substantial evidence does not exist in the record to support the ALJ's finding that Bush did not suffer from a severe impairment.

-9-

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

I find that substantial evidence supports the ALJ's failure to find that Bush's fibromyalgia constituted a severe impairment, but I find that substantial evidence does not support his failure to find that Bush's mental impairments constituted severe impairments. I will address each in turn, beginning with Bush's fibromyalgia.

On March 29, 1999, Bush presented to the emergency department at Russell County Medical Center with complaints of back and neck pain after lifting patients at her job. (R. at 181-82.) X-rays of the cervical spine yielded normal results. (R. at 187, 435.) An x-ray of the thoracic spine showed not acute osseous injury, and an x-ray of the lumbar spine was normal. (R. at 187, 435.) She was diagnosed with sprain and strain of the neck and lower back. (R. at 181.)

Case 1:05-cv-00022-PMS   Document 12   Filed 10/25/05   Page 10 of 28   Pageid#: 47

Bush saw Dr. Ranjy C. Basa, M.D., on August 3, 1999, with complaints of numbness and tingling in the calf muscles. (R. at 213, 470.) She denied any weakness of the lower extremities. (R. at 213, 470.) A physical examination revealed no erythema or joint effusion, she had full distal pulses and a neurologic examination was normal. (R. at 213, 470.) Dr. Basa diagnosed intermittent paresthesias of both legs of unknown etiology and heel pain, possibly secondary to plantar fascitis. (R. at 213, 470.) She was prescribed Relafen and Darvocet and was advised of stretching exercises for her heel. (R. at 213, 470.) On August 18, 1999, Dr. Basa noted that Bush's leg and heel pain were improved with Celebrex. (R. at 211, 468.) On December 6, 1999, Bush complained of low back pain with associated numbness of the right hip, as well as burning in both soles of the feet. (R. at 207, 464.) She denied numbness or weakness of the legs and stated that Relafen helped her leg pain. (R. at 207, 464.) An examination of the back revealed no palpable deformities, Bush's neurologic examination was grossly intact and no sensory or motor deficits were noted. (R. at 207, 464.) Dr. Basa diagnosed low back pain of unknown etiology and prescribed Celebrex and Darvocet. (R. at 207, 464.)

On February 11, 2000, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Report of Contact, concluding that, even though Bush experienced back, leg and foot pain at times, she was able to take care of her personal needs, drive as needed, care for her children, cook and perform light housework. (R. at 217.) Dr. Johnson noted that, based on the evidence before him, Bush's alleged symptoms and related restrictions did not appear to be credible. (R. at 217.) He concluded that Bush had no work-related restrictions. (R. at 217.) On April 6, 2000, Dr. Donald R. Williams, M.D., another state agency physician, completed a Report of Contact, arriving at the same conclusions. (R. at 228.)

Case 1:05-cv-00022-PMS   Document 12   Filed 10/25/05   Page 11 of 28   Pageid#: 48

On March 7, 2000, Bush continued to complain of low back pain that radiated into her legs. (R. at 205, 462.) A physical examination revealed mild tenderness of the lumbar paravertebral muscles bilaterally without muscle spasm. (R. at 205, 462.) Deep tendon reflexes were 2+, and Bush exhibited no motor or sensory deficits. (R. at 205, 462.) Dr. Basa diagnosed chronic low back pain. (R. at 205, 462.) Celebrex was discontinued, and Relafen was reinitiated. (R. at 205, 462.) On May 9, 2000, Bush complained of persistent low back pain that radiated into both legs, as well as bilateral elbow pain, swelling of both hands and lack of energy. (R. at 460.) A physical examination revealed muscle spasm in both trapezius muscles and spasms of the lumbar paravertebral muscles. (R. at 460.) Bush's neurologic exam was grossly intact, there was tenderness of the lateral epicondyle, but no effusion of the joints was noted. (R. at 460.) Dr. Basa diagnosed chronic low back pain of unknown etiology and right elbow pain, possibly secondary to lateral epicondylitis. (R. at 460.) She was prescribed Relafen, Ultram and Flexeril. (R. at 460.) On June 14, 2000, Bush underwent an MRI of the lumbar spine, showing an annular fissure at the L4-L5 level. (R. at 230, 483.) On July 12, 2000, Dr. Basa noted no palpable deformities of the lower back and no lumbar paravertebral muscle spasms. (R. at 457.) He further noted that Bush's neurologic examination was normal. (R. at 457.) She was diagnosed with chronic hip and back pain and was continued on Relafen. (R. at 457.)

Bush saw Dr. Timothy G. McGarry, M.D., an orthopaedist, on July 26, 2000. (R. at 234.) At that time, she reported continued aching pain in the low back radiating upwards. (R. at 234.) She denied any leg pain. (R. at 234.) A physical examination revealed diffuse tenderness in the lower lumbar region, and Bush's range of motion was markedly limited. (R. at 234.) Bush had negative straight leg raising at 90 degrees and her muscle strength was normal in all groups with grossly intact sensation. (R. at 234.) Dr. McGarry diagnosed persistent lumbosacral pain. (R. at

234.)  He noted that the MRI previously taken did not reveal a ruptured disc or any type of nerve involvement.  (R. at 234.)  Dr. McGarry wrote the Department of Rehabilitative Services, stating that Bush would benefit from physical therapy.  (R. at 233.)

On September 11, 2000, Bush reported remarkable relief of pain with Relafen. (R. at 455.)  A physical examination revealed direct tenderness of the lumbar paravertebral muscles without any palpable deformities and no neurologic deficits. (R. at 455.)  Bush was again diagnosed with chronic low back pain and was continued on Relafen.  (R. at 455.)  On October 13, 2000, Bush complained of multiple joint pains, including both shoulders, elbows, wrists and low back.  (R. at 453.)  She reported that Relafen helped her back pain.  (R. at 453.)  Dr. Basa noted multiple trigger points suggestive of fibromyalgia.  (R. at 453.)  Bush was diagnosed with multiple joint pain, possibly due to fibromyalgia.  (R. at 453.)  She was continued on Flexeril, Relafen and Darvocet.  (R. at 453.)  On November 17, 2000, Bush continued to complain of generalized body aches, noting that Darvocet temporarily relieved her pain.  (R. at 451.)  Dr. Basa again noted multiple trigger points suggestive of fibromyalgia.  (R. at 451.)  Bush's neurologic examination was grossly intact.  (R. at 451.)  She was again diagnosed with generalized body aches, possibly fibromyalgia or chronic fatigue syndrome, and was continued on Relafen, Darvocet and Flexeril. (R. at 451.)

Bush saw Dr. Shu Man-Fu, M.D., a rheumatologist at the University of Virginia Health System, on November 21, 2000, for an evaluation of possible lupus or related disorders.  (R. at 515-16.)  Bush reported an inability to perform any housework as a result of her joint pain.  (R. at 515.)  A neurologic examination revealed normal muscle strength and symmetrical deep tendon reflexes, as well as symmetrical

palpable pulses.  (R. at 516.)  Bush had a full range of motion in all peripheral joints, and there was no evidence of inflammatory arthritis or deformities.  (R. at 516.)  She exhibited diffuse trigger points and had significant tenderness over the bursa of both greater trochanters.  (R. at 516.)  Dr. Man-Fu further noted evidence of plantar fascitis and mild tenderness over the lower lumbar spine with no suggestion of radiculopathy.  (R. at 516.)  He noted that Bush's examination was most consistent with a diagnosis of fibromyalgia.  (R. at 516.)  Dr. Man-Fu further diagnosed severe great trochanter bursitis and plantar fascitis, both bilaterally.  (R. at 516.)  Dr. Man-Fu administered cortisone injections, which produced immediate pain relief.  (R. at 516.)  Bush was referred for physical therapy and advised to continue Relafen and Flexeril.  (R. at 516.)

Bush also was seen at the Arthritis Clinic at the University of Virginia that same day for a second opinion regarding her fibromyalgia diagnosis at Dr. Basa's referral.  (R. at 517-19.)  A physical examination revealed intact sensation, a full range of motion, no deformities and no evidence of synovitis.  (R. at 519.)  Various trigger points were noted, as well as tenderness of the lower lumbar spine.  (R. at 519.)  She was diagnosed with a fibromyalgia-like syndrome, plantar fascitis, bilateral greater trochanter bursitis and livedo reticularis.[7]  (R. at 520.)

On December 4, 2000, Bush continued to complain of low back pain.  (R. at 449.)  She reported that cortisone injections had produced temporary pain relief.  (R.

---

[7]Livedo reticularis refers to a vascular response to various disorders caused by dilation of the subpapillary venous plexus as a result of increased viscosity of the blood changes in the blood vessels themselves that delay blood flow away from the skin, and clinically characterized by the presence of a reticular cyanotic cutaneous discoloration surrounding pale central areas involving the extremities and trunk, which becomes more intense on exposure to cold and may disappear on warming.  *See* Dorland's at 948.

at 449.)  She also complained of weakness in both legs, worsened by lying down.  (R. at 449.)  A physical examination revealed spasms of the lumbar paravertebral muscles, 2+ deep tendon reflexes of the knees, no neurologic deficits and negative straight leg raising.  (R. at 449.)  Dr. Basa diagnosed low back pain, possibly secondary to muscle strain and fibromyalgia.  (R. at 449.)  Bush was continued on Relafen, Darvocet and Flexeril.  (R. at 449.)  On January 11, 2001, Bush reported improved symptoms of fibromyalgia with Flexeril.  (R. at 447.)  She was again diagnosed with fibromyalgia and was continued on Relafen and Darvocet.  (R. at 447.)  On January 26, 2001, Bush continued to complain of multiple arthralgias.  (R. at 446.)  Dr. Basa noted no acute joint effusion, and Bush's neurologic examination was grossly intact.  (R. at 446.)  She was diagnosed with fibromyalgia/chronic fatigue and was continued on Relafen, Darvocet and Flexeril.  (R. at 446.)

On February 28, 2001, Dr. Robert O. McGuffin, M.D., a state agency physician, completed a physical assessment, indicating that Bush could perform medium work.[8] (R. at 522-29.)  Dr. McGuffin further found that Bush could occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 525.)  He imposed no manipulative, visual, communicative or environmental limitations on Bush's work-related abilities.  (R. at 525-27.)  This assessment was affirmed by Dr. Johnson on May 9, 2001.  (R. at 529.)

Bush saw Dr. Basa from April 19, 2001, through May 8, 2003.  (R. at 601-16.)  Over this time period, she continued to complain of multiple joint pains and muscle

---

[8]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

aches.  (R. at 601-16.)  Physical examinations revealed tenderness of the heel with no palpable deformities, mild tenderness of the lateral aspect of the left knee, no acute joint effusion, that she was neurologically intact, muscle tenderness of the upper back and arms, 2+ deep tendon reflexes, muscle spasms in the thoracic and lumbar paravertebral muscles, no muscle atrophy or paresthesias of the lower extremities, tenderness of the trapezius muscles bilaterally and tenderness of the lumbar paraspinal muscles.  (R. at 601-02, 605-06, 608, 611, 613-16.)  Bush was diagnosed with multiple joint pains/muscle spasms, fibromyalgia, heel pain, possibly secondary to a calcaneal spur, generalized body aches and chronic low back pain.  (R. at 601-02, 605-07, 611, 613-16.)  She was treated conservatively with medications, including Relafen, Darvocet, Flexeril, Lortab, Arthrotec, Tylenol 3 and steroids, as well as exercises.  (R. at 601-02, 605-08, 611, 613-16.)  I note that there is evidence in Dr. Basa's treatment notes that Bush's condition was improved with medication.  For instance, on June 12, 2001, Dr. Basa noted that Relafen and Darvocet resulted in "remarkable relief of pain."  (R. at 615.)  On August 8, 2001, Dr. Basa reported that Lortab resulted in "remarkable relief."  (R. at 613.)  On October 4, 2001, Bush noted that Relafen relieved her muscle aches and joint pain. (R. at 611.)  Again, on January 22, 2002, Bush noted that Relafen helped her pain. (R. at 608.)  On February 4, 2003, she stated that Flexeril relaxed her muscles and helped her fibromyalgia.  (R. at 602.)

On March 27, 2003, Dr. Johnson completed a physical assessment, concluding that Bush could perform medium work, diminished by a limited ability to push and/or pull with the lower extremities due to her back pain.  (R. at 632-40.)  Dr. Johnson found that Bush could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds.  (R. at 635.)  He imposed no manipulative, visual, communicative or environmental limitations on Bush's work-related abilities. (R. at 636-37.)  Dr. Johnson found Bush's subjective allegations only

partially credible. (R. at 638.) This assessment was affirmed by Dr. F. Joseph Duckwall, M.D., another state agency physician, on June 23, 2003. (R. at 640.)

Bush again saw Dr. Basa on August 13, 2003, at which time she was again diagnosed with fibromyalgia and multiple arthralgias. (R. at 666.) Her medications remained unchanged. (R. at 666.) On February 4, 2004, Bush complained of left neck/shoulder pain. (R. at 674.) She exhibited tenderness over the left trapezius muscle, but had a full range of motion of the shoulder joint. (R. at 674.) Bush was diagnosed with acute muscle strain/spasms of the left trapezius muscle. (R. at 674.) Her medications were again continued, and she was advised to apply warm compresses to the affected area. (R. at 674.)

As outlined above, the record shows that Bush suffers from fibromyalgia. However, no or minimal limitations have been placed on her work-related physical abilities as a result of this condition by both treating and nontreating medical sources. Dr. Basa, Bush's treating physician, apparently placed no restrictions on her work-related abilities during his treatment of her from August 3, 1999, through May 8, 2003. This is consistent with Bush's physical examinations during Dr. Basa's treatment of Bush, which revealed no more than tenderness of various muscle groups. She, nonetheless, was consistently neurologically intact. Moreover, Bush's treatment has been conservative in nature, consisting of treatment with medications and exercises, which both Dr. Basa and Bush have noted to have improved her condition. It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Moreover, state agency physician Dr. Johnson concluded in February 2000, that Bush had no work-related limitations. (R. at 217.) Dr. Williams reached the same

conclusion in April 2000.  (R. at 228.)  In February 2001, Dr. McGuffin found that Bush could perform medium work and that she could occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 523, 525.)  This assessment was affirmed by Dr. Johnson.  (R. at 529.)  In March 2003, Dr. Johnson found that Bush could perform medium work, diminished by a limited ability to push and/or pull with the lower extremities.  (R. at 633.)  He further found that Bush could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds.  (R. at 635.)  This assessment was affirmed by Dr. Duckwall.  (R. at 640.)

Dr. McGarry, an orthopaedist, diagnosed persistent lumbosacral pain in July 2000, and noted that Bush would benefit from physical therapy.  (R. at 234.)  He placed no restrictions on Bush's work-related abilities.  Likewise, Dr. Man-Fu, a rheumatologist, noted that Bush's examination was most consistent with a diagnosis of fibromyalgia.  (R. at 516.)  Dr. Man-Fu further diagnosed severe greater trochanter bursitis and plantar fascitis, both bilaterally.  (R. at 516.)  He administered cortisone injections, which produced immediate relief, and Bush was referred to physical therapy and continued on her medications.  (R. at 516.)  Dr. Man-Fu placed no restrictions on Bush's work-related abilities.  Finally, Dr. Griffin, the medical expert, testified that, in his opinion, Bush did not have an impairment that met or equaled a listed impairment and that Bush had no significant functional exertional limitations. (R. at 109.)

For all of these reasons, I find that the ALJ did not err by failing to find that Bush suffered from a severe physical impairment.  The minimal restrictions placed on her by the state agency physicians would not significantly limit her ability to do basic work activities.  *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005).

I will now address Bush's alleged mental impairments. For the reasons that follow, I cannot find that substantial evidence exists in the record to support the ALJ's failure to find that she suffered from a severe mental impairment.

On August 3, 1999, Bush complained of having experienced depression for more than a year, stating that she worried a lot and lacked energy. (R. at 213, 470.) Dr. Basa diagnosed her with depression. (R. at 213, 470.) On August 18, 1999, Bush continued to complain of depression, noting crying spells and insomnia for at least the previous six months. (R. at 211, 468.) Dr. Basa again diagnosed depression and prescribed Zoloft. (R. at 211, 468.) On October 29, 1999, Bush complained of anxiety and depression and was continued on Zoloft. (R. at 209, 466.)

On February 16, 2000, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Bush had a nonsevere affective disorder. (R. at 218-27.) Leizer opined that Bush's mental allegations were partially credible, and he found that her mental impairment imposed no more than slight restrictions on her ability to perform substantial gainful activity. (R. at 220.) Specifically, he found that Bush was only slightly restricted in her activities of daily living, experienced slight difficulties in maintaining social functioning, seldom experienced deficiencies of concentration, persistence or pace and never experienced any episodes of deterioration or decompensation in work or work-like settings. (R. at 226.)

On May 9, 2000, Bush reported having felt depressed with crying spells and lack of energy. (R. at 459-60.) She was again diagnosed with depression and was prescribed Prozac. (R. at 460.) On July 12, 2000, Dr. Basa noted that Prozac "remarkably helped [Bush's] depression." (R. at 457.) She was diagnosed with major

depression, doing better, and her dosage of Prozac was increased. (R. at 457.) On September 11, 2000, Dr. Basa noted that Bush's depression was much better since her dosage of Prozac was increased. (R. at 455.) She was again diagnosed with major depression and was continued on Prozac. (R. at 455.) On October 13, 2000, Bush reported continued depression, though noting that Prozac helped her a lot. (R. at 453.) Her diagnosis remained unchanged. (R. at 453.) On November 17, 2000, Bush complained of being nervous. (R. at 451.) She was diagnosed with major depression and anxiety, not otherwise specified. (R. at 451.)

Bush was seen for intake at Wise County Counseling Center on December 7, 2000. (R. at 512-14.) At that time, she reported that she had been hospitalized seven years previously for manic depressive disorder.[9] (R. at 512.) Bush further reported that antidepressants helped her condition, but that she cried all of the time. (R. at 512.) She also noted anxiety attacks, difficulty concentrating and short-term memory problems. (R. at 512.) Bush began seeing Jessica Miller, B.S., for individual therapy on January 5, 2001. (R. at 504-11.) Miller diagnosed depressive disorder, not otherwise specified, and noted that treatment was necessary. (R. at 504.) Bush did not return until February 12, 2001, at which time Miller noted that Bush had a decrease in energy, anxiety, panic attacks, worrying, memory impairment, a decrease in appetite, loss of interest, low self-esteem, tearfulness and hypersomnia due to medications. (R. at 498-99.) Bush reported no suicidal or homicidal ideations. (R. at 493.) She again reported being psychiatrically hospitalized in the past for depression. (R. at 494.) She was diagnosed with depressive disorder, not otherwise specified, and a then-current Global Assessment of Functioning, ("GAF"), score of

_____

[9]I note that there are no notes contained in the record to substantiate this claim.

Case 1:05-cv-00022-PMS   Document 12   Filed 10/25/05   Page 20 of 28   Pageid#: 57

50.[10]  (R. at 492.)  On March 14, 2001, Bush reported feeling better with Xanax and Prozac.  (R. at 486.)

Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF on March 1, 2001, finding that Bush suffered from a nonsevere affective disorder.  (R. at 530-45.)  Jennings found that Bush was only mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and that there was insufficient evidence to determine whether she had experienced repeated episodes of decompensation.  (R. at 542.)  Jennings found Bush's subjective allegations partially credible, noting that her activities of daily living were limited mainly due to her physical condition and that the record showed a good response to medications.  (R. at 533, 544.)

Bush again saw Dr. Basa on April 19, 2001, with continued complaints of anxiety and depression, noting that she had been under a lot of stress at home.  (R. at 616.)  She was diagnosed with depression.  (R. at 616.)  By June 12, 2001, Dr. Basa noted that Bush's depression was stable, and he continued her Prozac and Xanax.  (R. at 615.)  On July 12, 2001, Bush reported continued depression and anxiety, but noted that Prozac helped.  (R. at 614.)  She was diagnosed with depression and continued on Prozac.  (R. at 614.)

On July 17, 2001, Bush again saw Miller for individual therapy, at which time

---

[10]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 41 to 50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..."  DSM-IV at 32.

Case 1:05-cv-00022-PMS   Document 12   Filed 10/25/05   Page 21 of 28   Pageid#: 58

she reported having experienced multiple panic attacks daily for the previous three weeks. (R. at 552.) She further reported extreme financial problems, making it impossible for her to obtain her prescription medications. (R. at 552.) Miller noted that Bush had a restricted affect and a very hopeless outlook on the future and her ability to work. (R. at 552.) Bush was discharged from therapy on November 9, 2001, for noncompliance. (R. at 623-25.)

On August 8, 2001, Bush's diagnosis and medications remained unchanged. (R. at 613.) On October 4, 2001, Bush reported being under a lot of stress at home and experiencing crying spells and insomnia. (R. at 611.) The following day, Dr. Basa prescribed Klonopin. (R. at 610.) However, this was discontinued on January 22, 2002, after Bush reported that it did not help her panic attacks. (R. at 608.) She was diagnosed with major depression with anxiety features, and Xanax was reinitiated. (R. at 608.)

Sharon J. Hughson, Ph.D., a clinical psychologist, completed an evaluation of Bush on March 7, 2002, at the referral of Disability Determination Services. (R. at 584-88, 592-96.) Bush reported having been in a "mental hospital" in 1998 due to marital problems.[11] (R. at 585, 593.) She further reported that she was seeing a mental health therapist, but had not attended in a few months. (R. at 585, 593.) Hughson noted that Bush was fully oriented, and she denied any insight or judgment problems. (R. at 585, 593.) She described herself as having become more withdrawn and stated that she stayed at home because people got on her nerves. (R. at 585, 593.) Although she had a driver's license, she stated that she did not drive due to panic attacks. (R. at 586, 594.) Bush stated that she spent time listening to the radio and

---

[11]I again note that Bush has submitted no records to substantiate this claim.

Case 1:05-cv-00022-PMS   Document 12   Filed 10/25/05   Page 22 of 28   Pageid#: 59

working puzzle books. (R. at 586, 594.) Hughson noted that Bush read and wrote within normal limits. (R. at 587, 595.)

Hughson administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), test, on which Bush obtained a verbal IQ score of 74, a performance IQ score of 77 and a full-scale IQ score of 74, placing her in the borderline range of intellectual functioning. (R. at 587, 595.) The Wide Range Achievement Test - Third Edition, ("WRAT-III"), revealed a fourth-grade reading score, a fourth-grade spelling score and a fifth-grade math score. (R. at 587, 595.) Hughson noted that Bush's low reading score on the WRAT-III eliminated the administration of the Minnesota Multiphasic Personality Inventory - Second Edition, ("MMPI-2"). (R. at 588, 596.) Hughson diagnosed Bush with a pain disorder associated with both psychological factors and a general medical condition, namely, chronic fibromyalgia. (R. at 588, 596.) She concluded that Bush was incapable of managing her own funds. (R. at 588, 596.)

Hughson also completed a mental assessment, concluding that Bush had a good ability to maintain attention and concentration and to understand, remember and carry out simple job instructions. (R. at 589-91, 597-98.) She found that Bush had a fair ability to follow work rules, to use judgment, to interact with supervisors, to understand, remember and carry out detailed job instructions and to maintain personal appearance. (R. at 589-90, 597-98.) In all other areas of functioning, Hughson found that Bush had poor abilities. (R. at 589-90, 597-98.)

On August 5, 2002, Bush complained of feeling nervous most of the time. (R. at 606.) However, on February 4, 2003, she reported having felt better since her husband left two months previously. (R. at 602.) Dr. Basa diagnosed Bush with

major depression and generalized anxiety disorder. (R. at 602.) On December 27, 2000, Bush was prescribed Xanax and on January 26, 2001, she was prescribed Prozac. (R. at 446, 449.)

On March 27, 2003, state agency psychologist Jennings completed a mental assessment, indicating that Bush was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to set realistic goals or make plans independently of others. (R. at 641-44.) In all other areas of functioning, Jennings found that Bush was not significantly limited, with the exception of the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, which she found no evidence of limitation. (R. at 641-42.) Jennings opined that, even with borderline IQ scores, as well as some anxiety and depression, Bush would still be capable of performing simple, unskilled, nonstressful work. (R. at 643.) She further opined that Bush's symptoms were partially credible. (R. at 643.) This assessment was affirmed by R.J. Milan Jr., Ph.D., another state agency psychologist, on June 23, 2003. (R. at 643.)

Jennings also completed a PRTF on March 27, 2003, finding that Bush suffered from an affective disorder and mental retardation and that a residual functional capacity assessment was necessary. (R. at 645-59.) She concluded that Bush was mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning, experienced moderate difficulties in maintaining

concentration, persistence or pace and that there was insufficient evidence to determine whether she had experienced episodes of decompensation. (R. at 655.) This assessment was affirmed by psychologist Milan on June 23, 2003. (R. at 645.)

On August 13, 2003, Bush reported that she was going through a separation with her husband which was making her feel more anxious and depressed. (R. at 665-666.) Dr. Basa diagnosed her with major depression with anxiety features and she was maintained on her medications. (R. at 666.) Crystal Burke, a licensed clinical social worker, noted that Bush's mood and thought content were depressed and that she was tearful. (R. at 665.) On November 5, 2003, Bush reported ongoing family stressors. (R. at 664.) She denied any suicidal or homicidal ideations and reported medication compliance. (R. at 664.) Burke noted that Bush was alert and oriented with a depressed mood and a flat affect. (R. at 664.)

Bush saw Edward E. Latham, Ph.D., a clinical psychologist, on March 1, 2004. (R. at 667-70.) Latham noted that Bush was alert and fully oriented with no pathological disturbance in thought processes, thought content or perception. (R. at 667.) Her mood was described as anxious and her affect as appropriate. (R. at 667.) Latham noted that Bush withdrew from difficult tasks. (R. at 667.) Bush reported seeing a mental health counselor every three months, but could not afford to go more often. (R. at 668.) She also reported difficulty concentrating and three or four panic attacks per week. (R. at 668.) Latham administered the WAIS-III test, on which Bush obtained a verbal IQ score of 77, a performance IQ score of 85 and a full-scale IQ score of 79, placing her in the upper borderline range of intellectual functioning. (R. at 668, 670.) The WRAT-III also was administered, revealing deficiencies in reading, spelling and math. (R. at 668, 670.) Finally, Latham administered the MMPI-2, the results of which he deemed to be of "questionable validity." (R. at 668, 670.) Bush's

Case 1:05-cv-00022-PMS   Document 12   Filed 10/25/05   Page 25 of 28   Pageid#: 62

scores on the MMPI-2 were not consistent with random responding, but Latham opined that her results might have been affected by her failure to sufficiently attend to the items. (R. at 668.) Latham further noted that the scores did not indicate that Bush was attempting to manufacture symptoms. (R. at 668.) However, he opined that she did not sufficiently understand the test items, thereby resulting in a profile unhelpful in understanding her current clinical issues. (R. at 668.)

Latham concluded that, even though Bush's full-scale IQ score fell at the upper end of the borderline deficient range, she appeared to be of overall low average intelligence, with some abilities in the average range. (R. at 669.) He noted that she showed evidence of having an emotional disturbance, as well as dysfunctional personality patterns. (R. at 669.) Bush was diagnosed with depressive disorder, not otherwise specified, panic disorder without agoraphobia with compulsive features and a personality disorder, not otherwise specified, with avoidant and dependent traits. (R. at 669.) Latham concluded that Bush could understand, retain and follow simple instructions and perform routine repetitive tasks. (R. at 669.) He rated her abilities to relate interpersonally and to handle everyday stressors as moderately impaired. (R. at 669.)

Latham also completed a mental assessment, finding that Bush had a fair ability to follow work rules, to deal with the public, to use judgment, to maintain attention and concentration, to understand, remember and carry out detailed and simple job instructions, to maintain personal appearance and to demonstrate reliability. (R. at 671-73.) In all other areas of functioning, Latham deemed Bush's abilities as poor. (R. at 671-72.)

As previously mentioned, an impairment can be considered nonsevere only if

it does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005). Here, even assuming that the ALJ properly rejected the assessments of psychologists Hughson and Latham, the fact remains that he did not address the March 27, 2003, mental assessment and accompanying PRTF completed by state agency psychologist Jennings and affirmed by state agency psychologist Milan. In this assessment and PRTF, the state agency psychologists found that Bush was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to set realistic goals or make plans independently of others. (R. at 641-44.) They further concluded that Bush experienced moderate difficulties in maintaining social functioning. (R. at 655.) While the ALJ noted in his decision Jennings's earlier PRTF, completed in March 2001, in which she placed only mild restrictions on Bush's work-related mental abilities, (R. at 50, 530-45), he did not address Jennings's more recent findings. I further note that the ALJ accepted the findings of Schacht, the psychological expert, but the ALJ posed no questions to Schacht that included the limitations imposed by Jennings in 2003.

Finally, I note that, despite Bush's alleged mental impairments, the ALJ failed to solicit the testimony of a vocational expert.[12] It is well-settled that "if [claimant]

---

[12]Although the first page of the transcript of the August 23, 2004, hearing, states that Norman Hankins, a vocational expert, testified at the hearing, no such testimony is included in the transcript. (R. at 101.)

demonstrates the presence of nonexertional impairments, the [Commissioner], in order to prevail, must be required to prove by expert vocational testimony that, despite [claimant's] ... nonexertional ... impairments, specific jobs exist in the national economy which [she] can perform." *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983.)

For all of these reasons, I cannot find that substantial evidence supports the ALJ's failure to find that Bush suffered from a severe mental impairment.

*III. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and Bush's claims will be remanded to the ALJ for further consideration of whether Bush's mental impairment is, in fact, severe and, if so, what effect that impairment has on Bush's work-related mental abilities. The ALJ is further instructed to obtain the testimony of a vocational expert.

An appropriate order will be entered.

DATED:      This 25th day of October, 2005.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE